# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,
    **Plaintiff**,
    **v.**

a. **$1,000,000.00** contained in Charles Schwab & Co., Inc. account **#9991-8933**, in the name of Donald Keith ELLISON, seized on April 26, 2019;

b. **$3,425,512.93** contained in Charles Schwab & Co., Inc. account **#9991-8933**, in the name of Donald Keith ELLISON, seized on June 18, 2019;

c. One (1) **Myco Boat Trailer Vin #1M9BA4031JB817150**;

d. One (1) **Caterpillar Model D5K2LGP Tractor, Serial Number KYY01200**;

e. One (1) **Caterpillar Model 320EL Hydraulic Excavator, Serial Number WBK02864**;

f. **$71,551.40** contained in checking account number **855356700** at JP Morgan Chase, account is in the name of Donald Keith Ellison;

g. **$276,583.84** contained in savings account number **3653269077** at JP Morgan Chase, account is in the name of Donald Keith Ellison;

h. **$100,306.70** contained in savings account number **317222591** at JP Morgan Chase, account is in the name of Keith Ellison and Jakyln F. Garrett;

i. One (1) **2018 Invincible 40-foot catamaran Hull #IVBC0035B818**;

j. One (1) **2018 Ford F-150 "XL" crew cab pickup truck, VIN #1FTEW1E50JFB84787**;
    **Defendants**.

CIVIL NO. 19-1693 (ADC)

**ORAL ARGUMENT REQUESTED**

## DEFENDANT DONALD KEITH ELLISON'S MOTION FOR PARTIAL RELEASE OF ASSETS AND TO LIFT STAY OF DISCOVERY

This Motion seeks relief from the hardship created by a combination of Government action and the delay of the trial caused by the COVID pandemic. Mr. Ellison requests that (1) certain assets belonging to him and seized by the Government approximately two years ago be released pending trial in the criminal case, and (2) the Court lift the stay in this civil forfeiture case, including modifying the stay to permit limited discovery.[1]

---

[1] Because this pleading raises both Motions and is better briefed in a single pleading, Mr. Ellison has filed a request for leave to exceed the page limit contained in Local Rule 7(e) concurrently with this Motion.

First, Mr. Ellison requests the return of (1) his tractors; (2) his fishing boat; (3) his pickup truck; and (4) $571,384 in cash or securities (a small percentage of the total amount seized). This property is requested because the Government seized assets to which it is not entitled and so that Mr. Ellison can earn income, preserve and maintain the value of the property, and pay his expenses and those for his family and business. Second, Mr. Ellison asks this Court to lift the stay in this civil case and convene a discovery and scheduling conference. The Government's prosecution of its criminal case will not be prejudiced. The Government has effectively conceded this by failing to object to civil discovery in other parallel proceedings and also representing that its investigation and all criminal discovery are complete. There is, thus, no reason to continue the stay of civil forfeiture proceedings.

As this Court knows, this civil case is related to a criminal case pending in this same Court. *See United States v. Tribble*, No. 3:19-cr-00541. Mr. Ellison filed this Motion for Partial Release of Assets in that criminal case. *See id.*, Dkt. 167. This Court denied the Motion in the criminal case (*id.*, Dkt. 191), for the reason that "Ellison has filed his motion in the wrong proceeding. Ellison's motion applies to the civil forfeiture proceeding in Civil No. 19-1693." *Id.* at 1–2. This Court also declined to consider in the criminal case the discovery stay that was entered in this civil case. *Id.* at 3. This Court ordered the production of Agent Lopez's affidavit underlying the seizures, after the Government argued to this Court that disclosure of the affidavit would "appease concerns defendant has that the assets seized are not traceable to the offenses charged." *Id.*, Dkt. 171 at 8. After reviewing Agent Lopez's affidavit (Dkt. 2, Ex. 1), it is clear that the Government misled this Court because the affidavit does not allege *any* misconduct by Mr. Ellison before February 2018. The criminal Indictment does not either. As such, none of the money that Mr. Ellison earned before February 2018 is traceable to the offenses charged. For these reasons, Mr. Ellison respectfully files the Motion in the civil forfeiture case.

## THE PROBLEM

Mr. Ellison is the father and provider for three children. He has been deprived of his assets for 21 months through the pandemic without being afforded the opportunity to contest the seizure, much less request any discovery in this civil forfeiture case. The Government seized property before the Indictment. Mr. Ellison filed a claim for its return. The Government then filed this civil action in forfeiture. However, the Government then moved to stay the civil proceedings effectively preventing Mr. Ellison from having an opportunity to contest the seizure. Mr. Ellison has no other recourse available to obtain his property because the indefinite discovery stay currently relieves the Government of its obligation to prove its case. Due to the COVID pandemic, Mr. Ellison has no way to obtain his day in court for the foreseeable future. His property has been seized without him ever having had a chance to challenge the seizure and without any prospect of obtaining a speedy trial to clear his name and recover his assets. The Government seized property to which it was not entitled (see detailed proof below). His property is depreciating. His equipment is unavailable to him to earn a living. He cannot maintain the significant real and personal property that he believes he will eventually recover.

Without the relief sought in this Motion, Mr. Ellison has no ability to live or preserve his assets pending trial, which has been substantially delayed through no fault of his own. In addition, as detailed below, the Government has employed discovery rules inconsistently and tactically by selectively asserting its right to stay civil discovery when it benefits the Government but allowing civil discovery to proceed when it hurts Mr. Ellison. The result of the Government's tactic is to pressure Mr. Ellison into relinquishing his constitutional rights by applying unjust economic pressure to him and his family through excessive and unwarranted pre-Indictment seizures.

The actions of the Government that have provoked this Motion are as follows:

1. <u>The Government Seizes Nearly All of Mr. Ellison's Property Before Any Indictment or Trial</u>. In May 2019, five months before the Indictment was issued, and based solely on allegations

in a sealed *ex parte* affidavit, the Government used its forfeiture powers to seize every substantial asset of Mr. Ellison.   These seizures included both assets that have no connection to any work by Cobra Acquisitions,  LLC ("Cobra")  in Puerto Rico and assets that are necessary for Mr. Ellison to earn a living  pending  this case and to pay his expenses, including  taxes owed to the Government. The seized assets are listed in the Indictment  and included  all his bank accounts, all his farm equipment,  a truck, a fishing  boat, and his homes.  *Lis pendens* were recorded against Mr. Ellison's homes making them unavailable  for loans or sale or to provide support for Mr. Ellison.

The assets in question  are not trivial.   The Indictment  specifies $4,425,510 in securities accounts; $448,440  in  savings  and  checking  accounts;  a  fishing  boat  that  cost  approximately $800,000  and is now worth approximately  $600,000;  two caterpillar farm tractors; and a new Ford F-150 pickup truck.  The securities accounts have appreciated in value since the time of the seizures. At this time, they are worth approximately $5,139,000  — far more than the Government seized.

Mr. Ellison  is virtually  unemployable  in his field and has been unable to find employment since the Indictment  was publicly  announced at a press conference.  Mr. Ellison  has been living  on his wife's earnings and savings, a state tax refund, and net proceeds from the sale of an investment condominium  in Florida  that he was able to sell before the Government recorded a *lis pendens* against all his real property.  However, those funds are nearly exhausted.

2.  <u>The Government  Seeks a Stay of Its Own Civil  Case</u>.  The Government  gave no explanation for the seizures, sealed all its records, and filed a forfeiture action only after Mr. Ellison sought return of his property. Finally,  on July 18, 2019, the Government brought this civil forfeiture case in this District.  On the same day it filed the forfeiture action, the Government sought to stay the forfeiture action.  Another Judge in this District granted the motion without hearing a response from Mr. Ellison.  Mr. Ellison  moved to lift the stay on August 19, 2019, citing the need to conduct discovery to set aside the excessive seizure and hardship.  That motion remains pending  more than a year later and is ripe for a ruling.  The civil forfeiture case was then transferred to this Court.

In an ordinary civil forfeiture case, Mr. Ellison would be entitled to discovery and a prompt hearing before the Government could confiscate his property. *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property." (citing cases)). In a criminal forfeiture case, the Government would be limited to seizing only assets that are traceable to a specific offense. *United States v. Pagan-Romero*, No. 14-333-GAG/SCC, 2014 WL 2451508, at *1 (D.P.R. June 2, 2014) ("Section 853 explicitly authorizes pre-conviction restraint of directly-forfeitable assets, but it does not so authorize the restraint of substitute assets." (adopting *United States v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir. 2007)). Substitute assets can be forfeited only after a criminal trial and a conviction. *United States v. Pagan-Romero*, No. 14-333-GAG/SCC, 2014 WL 2739419, at *1 (D.P.R. June 17, 2014) ("[S]ubstitute assets may not be restrained until after both a conviction of the defendant *and* a finding that the primary forfeiture assets were unavailable." (emphasis in original)); *accord United States v. Boyer*, 58 F. Supp. 3d 173, 175 (D. Mass. 2014) (citing *Jarvis*, 499 F.3d at 1204 and *United States v. Parrett*, 530 F.3d 422, 429–31 (6th Cir. 2008) (collecting cases from the Second, Third, Fifth, Eighth, and Ninth Circuits, which did not allow pretrial restraint of substitute assets)); *see also Medina-Rodriguez v. $3,072,266.59*, 471 F. Supp. 3d 465, 475 (D.P.R. 2020) (Besosa, J.) ("Civil forfeiture is contingent on the premise that [defendants] violated predicate criminal statutes[.]").

By filing this civil forfeiture case, staying it, and then commencing a criminal forfeiture action as part of the Indictment in the criminal case, the Government has attempted to gain the best of both worlds: The Government sought a civil pretrial seizure of assets than are not traceable to any alleged offense and then used its criminal case to prevent the return of the assets, thus obtaining relief indirectly to which it would otherwise not be entitled directly. The Indictment does not list any loss amount, does not specify a theory or formula for a loss amount, and the Government has not provided one throughout the case. The Government cited its pending criminal investigation as

justification for the stay, claiming that civil discovery would impair its investigation. However, as set forth below, that is no longer true.

      3. <u>The Government Allows Other Civil Discovery to Proceed</u>. The Government has not been consistent in its approach to allowing civil discovery in this matter. After the Indictment, on January 21, 2020, a private company named MasTec Renewables Puerto Rico LLC ("MasTec") sued Mammoth Energy Services, Inc. and Cobra in the Southern District of Florida. No. 20-20263-Civ-RNS (S.D. Fla.) (the "MasTec Litigation"). Mr. Ellison was the President of Cobra at all relevant times during the conduct alleged by the Government in this case. MasTec's civil complaint incorporates by reference the Government's Indictment and raises identical issues. Seeing an opportunity to profit from the Indictment, MasTec, a competitor of Cobra, claims that it was deprived of business because of favoritism towards Cobra. Discovery in that case closed on February 25, 2021. The parties obtained full civil discovery of the exact allegations in the Indictment. They subpoenaed from Mr. Ellison the criminal discovery produced, as well as deposed Mr. Ellison and several other key Government witnesses. *See* Exs. A–B. This civil discovery placed Mr. Ellison in the position of either asserting his Fifth Amendment rights, thus prejudicing his former employer and risking the reputational and collateral consequences of an adverse civil verdict in that case; or relinquishing his Fifth Amendment rights and testifying. The civil discovery also exposed the Government's witnesses to civil depositions on the same matters alleged in the Indictment.

      When Mr. Ellison brought this civil discovery to the Government's attention and asked if it intended to stay the discovery, the Government declined to get involved or seek a stay. *See* Ex. C. Presumably, the Government was no longer concerned about civil discovery harming its criminal case. In a hearing before Magistrate Judge Torres in the Southern District of Florida on January 28, 2021, Judge Torres ruled that discovery could proceed against Mr. Ellison and that the parties seeking civil discovery of the discovery in this criminal case would need to seek relief from this

Court's protective order in this Court. The Government did not appear at the hearing or contest the civil discovery being sought.

4. <u>The Government Resists All Discovery Requests in the Criminal Case</u>. The Government has successfully disclaimed any duty to seek information from other agencies in the criminal case that would relate to Mr. Ellison's right to return of his property. *See Tribble*, Dkt. 177 & 178.

Given that Mr. Ellison is not able to request further discovery in the criminal case from FEMA (and other agencies), as well as documents relating to Mr. Garffer's bribery solicitation, Mr. Ellison is effectively precluded from gaining access to the information needed to retrieve his assets and defend himself, unless this Court permits discovery in this civil case. *Cf. United States v. $8,850 in U.S. Currency*, 461 U.S. 555, 564 (1983) (observing that the due process concern spurred by inaction in a forfeiture case "mirrors the concern of undue delay encompassed in the right to a speedy trial").

## **ARGUMENT**

I. **The Court should order the return to Mr. Ellison of assets to which the Government lacks a presumptively valid claim and which are needed for Mr. Ellison to live pending trial.**

A. **The Government has seized excessive assets.**

1. <u>Mr. Ellison earned salary and bonuses that have nothing to do with the conduct alleged in the Indictment.</u>

An official act of bribery requires an exchange of a gift for an official act. 18 U.S.C. § 201 (b)(1)(A) ("Whoever . . . directly or indirectly, corruptly gives, offers or promises anything of value to any public official . . . with intent to influence any official act"); *McDonnell v. United States*, 136 S. Ct. 2355, 2371 (2016). A *quid pro quo* is required. *Id.* at 2372 ("Section 201 prohibits *quid pro quo* corruption—the exchange of a thing of value for an 'official act.'").

Mr. Ellison and Dr. Ahsha Nateef Tribble ("Dr. Tribble") did not meet until November 22, 2017, and the Government does not allege that anything of value was given to Dr. Tribble until

sometime in February 2018.  *See Tribble*, Indictment, ¶ 42.  District Judge Bernard Jones of the Western District of Oklahoma recently granted Mr. Ellison's motion to dismiss a securities fraud complaint made against him because the criminal Indictment contained no allegations of wrongdoing by Mr. Ellison before February 2018.  *In re Mammoth Energy Servs., Inc. Secur. Litig.*, No. CIV-19-522-J, at 6 (W.D. Okla. Jan. 26, 2021) (the "Securities Case").  The Securities Case involved the same facts as alleged in the criminal Indictment and was premised on an alleged failure to disclose the facts alleged in the Indictment.  Judge Jones made this finding after "carefully reviewing" the allegations contained in the Indictment, accepting all of the allegations as true, and determining that the first alleged gift from Ellison to Tribble was made on February 7, 2018.  *Id*.  Judge Jones is correct that there is no alleged wrongful conduct before February 2018.

Mr. Ellison began working for Cobra on January 5, 2017, nine months before Hurricane Maria struck Puerto Rico, ten months before Cobra had a contract with PREPA, and thirteen months before any alleged misconduct.  In 2017, he had an annual base salary of $300,000 and was eligible for discretionary bonuses based on Cobra's performance.  Beginning in January 2018, he was entitled to a base salary of $600,000 per year and bonuses equal to 3% of Cobra's EBITDA.  *See* Ex. H (showing Mr. Ellison earned a bonus of $1.335 million as 3% of Cobra's EBITDA in January 2018).  Mr. Ellison's base salaries were guaranteed and had nothing to do with the amount of any work performed by Cobra in Puerto Rico or otherwise.  As set forth below, all of his 2017 bonuses and much of his the bonus he received in 2018 was earned prior to any alleged misconduct.  In addition, Cobra had other business unrelated to Puerto Rico that contributed to Mr. Ellison's compensation as well.  Prior to executing a contract with PREPA for Hurricane Maria relief, Cobra had already launched a North American business and was growing rapidly.

Even assuming that all of Mr. Ellison's bonuses were the result of work done by Cobra in Puerto Rico, Mr. Ellison earned compensation from Cobra *before* any alleged misconduct occurred. For 2017, he earned $300,000 in salary and received discretionary bonuses of $696,000, for a total

of $996,000. *See* Exs. I & J (bonus payments of $196,700.41 and $499,686.96). In January of 2018, Mr. Ellison earned a President's bonus of $1.335 million based on a percentage of Cobra's EBITDA (3%) and monthly base salary of $50,000. *See* Ex. H. Thus, the total income earned by Mr. Ellison before any alleged misconduct was approximately $2,381,000 ($300,000 plus $696,000 plus $1.335 million plus $50,000). This income was based on Mr. Ellison's (1) base salary, which was guaranteed and had nothing to do with any work in Puerto Rico; and (2) bonuses for which he was eligible prior to any purported misconduct.

In addition to compensation he received before any alleged misconduct, much of what Mr. Ellison received after the commencement of the alleged misconduct in February 2018, was actually earned based on events that occurred before the alleged misconduct. For example, Cobra's initial contract in October 2017 was for $200,000,000. Based on Cobra's standard margin, that revenue equates to approximately $100,000,000 in EBITDA, or a $3 million bonus for Mr. Ellison based on his employment agreement. Moreover, PREPA agreed to raise the amount of the Cobra contract to $450,000,000 on December 7, 2017 — again, long before any alleged misconduct and at a time when Mr. Ellison and Dr. Tribble had barely met. *See* Ex. D. Based on Cobra's standard EBITDA margin, the additional $250,000,000 in contract value to be earned in 2018 equates to an earned bonus of approximately $3.75 million having nothing to do with any alleged misconduct. Mr. Ellison earned these bonuses before any alleged misconduct occurred and are not traceable to the allegations here.

The Government has offered no documentary or other evidence to contradict that Mr. Ellison earned a significant portion of his compensation and bonuses before any alleged misconduct occurred. In the criminal case, the Government requested, and this Court ordered, the disclosure of FBI Special Agent Juan Carlos Lopez's affidavit supporting the verified complaint in this case. *See Tribble*, Dkt. 191 at 4. The Government claimed that disclosure of the affidavit would "appease" Mr. Ellison's concerns that the assets seized are not traceable to the alleged offenses. *Id.*, Dkt. 171 at 8. The Government is wrong. Agent Lopez's affidavit contains only conclusory statements and

unsupported temporal correlations in an attempt to justify the excessive seizure of Mr. Ellison's assets. In particular, Agent Lopez's affidavit further confirms that none of the allegations of misconduct, even if true, can be traced to money Mr. Ellison earned before February of 2018. The vast majority of the allegations contained in Agent Lopez's affidavit are for events occurring in mid-2018 or later. There is not a shred of an allegation of misconduct against Mr. Ellison detailed in Agent Lopez's affidavit that occurred before February 2018.

Further, conclusory statements by the Government or Agent Lopez do not relieve the Government of its burden. This Court has recognized that the Government cannot simply rely on its blanket assertions that the assets are traceable to the alleged misconduct. *Medina-Rodriguez v. $3,072,266.59 in United States Currency*, 471 F. Supp. 3d 465, 474 (D.P.R. 2020) (Besosa, J.) ("The United States may not, however, 'seize and continue to hold property upon conclusory allegations that the defendant property is forfeitable.'" (citation omitted)). "[T]he burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture." *United States v. 6 Fox Street*, 480 F.3d 38, 42 (1st Cir. 2007) (18 U.S.C. § 983(c)(1) "increased the government's burden to prove that the defendant property is subject to forfeiture 'from mere probable cause (the old standard) to the preponderance of the evidence.'").

In addition to containing no allegations of misconduct by Mr. Ellison before February 2018, Agent Lopez's affidavit is misleading and is littered with inaccuracies. For example, Agent Lopez asserts that Mr. Ellison gave an improper gift to Dr. Tribble by purchasing tickets for her to the show Hamilton for the amount of $1,831.94 in August 2018. Dkt. 2, Ex. 1, ¶¶ 46–47. However, Agent Lopez omits that Dr. Tribble *paid* for those tickets. Indeed, Dr. Tribble sent a Chase electronic payment to Mr. Ellison for the amount of $1,900 with a memo "Payment for tickets." Ex. E. Only a flawed and incomplete investigation could lead to such a mistake by the Government whereby they seized Mr. Ellison's property based on facts that are objectively false.

For deciding this Motion, though, the Court does not need to make determinations of whether Agent Lopez's statements are true or false. Instead, Mr. Ellison has the due process right to challenge the false statements made in Agent Lopez's affidavit and to retrieve wrongfully seized property. Because the stay is in place, Mr. Ellison has no way to fully challenge these false statements to show that they are false (as indicated above where Dr. Tribble paid him *more* for the tickets than the amount he spent). None of the quotes from e-mails and communications in the affidavit are inculpatory in a bribery case in any way. Most of the allegations in Agent Lopez's affidavit are ones of timing — Mr. Ellison did something on one day and Dr. Tribble did something on another day. There is no link stated. Mr. Ellison should be able to challenge those allegations to show that the required evidentiary links are missing. Instead, though, Mr. Ellison has no ability to challenge these allegations, as this case has been and continues to be stayed indefinitely while Mr. Ellison's property remains seized.

    2.    <u>The Government seized everything Mr. Ellison had saved, regardless whether those assets had anything to do with his work in Puerto Rico or any misconduct.</u>

        a.  *The Government seized almost everything Mr. Ellison owns or has saved.*

To date, the Government has taken the following actions to seize, freeze, or encumber Mr. Ellison's assets:

1. On May 19, 2019, the Government obtained a seizure warrant for $1,000,000 in a Charles Schwab account in San Francisco California. The $1,000,000 limitation was endorsed on the face of the warrant by Magistrate Judge Velez-Rive.

2. On June 28, 2019, for reasons that are still unclear, the Government obtained a second seizure warrant for the Charles Schwab account from a different magistrate, Magistrate Judge Carreno-Coll increasing the amount of the Schwab seizure to $3,425,512.

3. On April 26, 2019, the Government obtained a seizure warrant again from Magistrate Judge Velez-Rive for $2,175,934 in a JP Morgan account in New York, New York.

4. On April 26, 2019, the Government obtained a seizure warrant from Magistrate Judge Velez-Rive for $578,380 in a JP Morgan savings account in New York.

5. On April 26, 2019, the Government obtained a seizure warrant against a joint savings account held in the name of Mr. Ellison and his spouse, Jaklyn Garrett for $107,995.

6.  On April 26, 2019, the Government obtained a seizure warrant from Magistrate Judge Velez-Rive for a 40 foot catamaran outboard motor fishing boat ("the fishing boat").

7.  On or about April 26, 2019, the Government obtained a seizure warrant for Mr. Ellison's 2018 Ford F-150 pickup ("the Truck").  The Truck has a lien on it in favor of Ford Motor Company Credit.

8.  On or about June 18, 2019, the Government obtained seizure warrants from Magistrate Judge Carreno-Coll for Mr. Ellison's farm equipment, specifically: a Caterpillar 320EL Excavator, and a Caterpillar D5 Tractor (Dozer).

9.  On or about November 25, 2019, the Government obtained orders from this Court authorizing *lis pendens* to be filed against real property located in Florida and Georgia. (Dkt. 64, 66).  The Georgia property is Mr. Ellison's home, and the Florida property is a second home he purchased in Panama City, Florida.  The orders were issued the same day the Government filed its applications and before Mr. Ellison had an opportunity to respond.

10. In July 2019, Mr. Ellison's credit card accounts were closed following the Government's notice to the credit card issuer of its claims.

The aggregate effect of the combined seizures is that Mr. Ellison has been deprived of nearly everything he owns or can monetize.  He has been living on proceeds from the sale of one piece of property that was sold before the *lis pendens* were obtained, tax refunds, and his wife's earnings. All of those resources are nearly exhausted as this case extends now well into its second year.  *See $8,850*, 461 U.S. at 565 ("We regard the delay here—some 18 months—as quite significant.  Being deprived of this substantial sum of money for a year and a half is undoubtedly a significant burden."). He has only one car left for a family of five with three school-aged children.[2]  Mr. Ellison continues to have obligations to maintain the property that he cannot sell, to pay child support to his ex-wife for the care of his three children, to pay childcare expenses when he has physical custody of his children, to pay taxes on moneys he received but cannot access, to live, and to seek employment.

---

[2] Motor vehicles have particular importance in the due process context for their use as a mode of transportation and the means to earn a livelihood.  An "individual has an important interest in the possession of his [or her] motor vehicle," which is "often his [or her] most valuable possession." *Krimstock*, 306 F.3d at 60.  The length of deprivation of the use of a vehicle "increases the weight of the individual's interest in possessing the vehicle. *Simms v. District of Columbia*, 872 F. Supp. 2d 90, 101 (D.D.C. 2012).  And that weight cannot be recovered after the fact if the defendant ultimately prevails at trial and is entitled to return of the vehicle. *Id*. at 103.

   b.  *The securities accounts seized by the Government have increased in value and now hold excess sums.*

As of December 31, 2020, Mr. Ellison's Schwab account held $5,146,605.   Ex. F.   That amount is $721,000 more than was authorized for seizure by the two Schwab warrants.  The increase in value has nothing to do with any alleged misconduct.  It simply reflects the increase in value of the accounts.  The excess funds are not part of any salary or bonus related to the conduct alleged in the complaint.  The Government is, therefore, significantly over-secured.

## B.  Mr. Ellison has substantial need for the assets.

Mr. Ellison has substantial needs for release of the assets requested in this Motion.  Mr. Ellison has diligently pursued employment since his pretrial release.  However, the Indictment in the criminal case was announced with great fanfare by the Government in a widely-reported press conference. Mr. Ellison was employed in a senior role at a publicly traded electrical grid construction company.  The Indictment, even without a conviction, has made Mr. Ellison radioactive from the viewpoint of any company that contracts with the Government, including the type of companies that build electrical grids and are heavily regulated by the Government.  He was an Army Ranger before he worked in the electrical grid industry.  He was honorably discharged with a medical condition related to his service in the military.   Because he is currently unable to obtain employment in the electrical grid industry, he wishes to earn a living using the assets he accumulated with money he earned that has nothing to do with this case but was seized anyway.  He wants to:

1. work his farm by engaging in a small lumber business that requires clearing, cutting, and hauling.  Mr. Ellison lives in a house in Georgia surrounded by trees and forest.  The tractors that were seized were intended to provide a means of harvesting this lumber and maintaining the property.  Now that he is unemployed, the tractors represent the means by which he can earn a living while this case is pending;

2. engage in a small private grading business assisting homeowners and small business with small development projects in Georgia. For this, Mr. Ellison needs his tractors returned and enough money to pay for a small amount of additional equipment needed for this small business; and

3. operate a small charter business using the fishing boat that was seized, if possible.

Mr. Ellison has prepared a budget, attached hereto as Exhibit G, to demonstrate that a small grading and lumber business will provide a modest income for him pending the trial in this matter. The budget is further discussed below.

The Government has no use for the tractors. They sit in a yard and depreciate. Mr. Ellison will care for and maintain the equipment, and measures can be imposed to ensure that they are not removed from the Court's jurisdiction.

Mr. Ellison has no other funds available for his living needs. He has been living on a tax refund, the proceeds he realized from selling one piece of property before the Government issued its *lis pendens*, and his wife's occasional income and savings. Those sources will be exhausted before trial in this case and are insufficient to pay the expenses described below.

Mr. Ellison's reasonable expenses are significant because of his situation prior to this case being commenced. His expenses fall into five main categories:

(1) Living expenses. Mr. Ellison's living expenses include child support for his three children, all under the age of 18. Mr. Ellison is the principal source of support for his children.

(2) Expenses to maintain and preserve the very assets the Government has seized or encumbered. Although the amount set forth in his budget is a sizeable amount and would exceed a reasonable budget for an average person, here, Mr. Ellison had substantial assets before this case and is seeking to preserve their value. Preservation of two separate properties and an expensive fishing boat takes money. There are insurance payments, property taxes, home owners dues, and utilities to be paid. Currently, Mr. Ellison believes the Government is not maintaining the fishing boat. The

boat has four outboard engines that must be flushed regularly and maintained.  In addition, the boat is made of fiberglass and must be regularly cleaned and maintained to avoid permanent damage to the hull and deck.  The tractors must be maintained or risk incurring expensive repair bills.  If the Government ultimately succeeds with its forfeiture claims in this case, it is in the Government's interest that Mr. Ellison be allowed to maintain these assets before trial to preserve as much of their value as possible.   Mr. Ellison and the Government are harmed by the Government's uncompromising stance on the seizures.

(3) <u>Expenses to operate a small lumber business on his property in Georgia</u>.  Starting the business will require the purchase of a small number of tools and equipment, fuel, and repairs and maintenance for the vehicles.

(4) <u>Tax expenses</u>.  Mr. Ellison has federal taxes to pay.  He has been assessed taxes for funds that he does not have, and which have been taken by the Government.  Mr. Ellison currently owes approximately $162,000 in federal taxes and has no funds with which to pay.  The resulting tax lien that may be created will impact not only Mr. Ellison but also his wife with whom he files jointly.

(5) <u>Funds needed to pay Ford Motor Credit for the F-150 pickup seized by the Government</u>. There is a balance owed on the Truck, which must be paid to Ford Motor Company.  Mr. Ellison will pay the balance out of the funds returned by the Government if the Court orders that they be returned. The payment will benefit both the Government, which occupies a junior creditor position on the Truck, and Mr. Ellison who will begin to repair his credit. The Truck is simply depreciating in the Government's possession.

Based on these expenses, Mr. Ellison requests (1) return of the tractors so he can use them to earn income; (2) return of his fishing boat so he can either use it as part of a charter business or maintain it to preserve its value; (3) return of the Truck so it can be used in the business and Ford Motor Company Credit be paid off; (4) release of $571,384 in cash or securities to permit him to pay his taxes, to pay child support, to pay funds needed to maintain his real and personal property, funds

on which to live in the short term, and funds to establish a small lumber business in an effort to support himself and his family.[3]  Mr. Ellison has prepared a budget that shows the amount he needs over the next 12 months to pay known expenses and begin cutting lumber on his property in Georgia. This amount is a fraction of the excess funds seized by the Government.  As noted above, there is at least $700,000 in excess value in Mr. Ellison's Schwab Account that has accumulated since the seizure, and his pre-alleged misconduct salary and bonuses were at least $2,381,000.  It bears repeating, that the returned personal property will not be out of reach of the Government.  It will simply be available for Mr. Ellison's use pretrial.

**C.      The Government will suffer no prejudice from the return of property.**

The Government will suffer no prejudice from the return of the property:

1. <u>Tractors</u>.  There is no risk that the tractors will be removed from the jurisdiction of the Court.  Mr. Ellison will agree to any reasonable measures to ensure that, including tracking devices or other technology to ensure that they remain on his property and are not sold or moved.

2. <u>Truck</u>.  The Truck needs to be returned for use in the business, along with sufficient cash to pay Ford Motor.  The truck has depreciated in the Government's possession for the last 21 months.

3. <u>Taxes</u>.  $162,000 of the cash requested will be paid to the federal government in satisfaction of federal tax claims.  No prejudice will occur, because the money will be returned to the Government.

4. <u>Fishing Boat</u>.  It is common sense to return the fishing boat so that Mr. Ellison can maintain it.  Mr. Ellison does not seek return of his fishing boat to live a lavish lifestyle.  He wants to maintain it and keep it safe for the day he prevails in this case, or the day the Government establishes at trial a legal right to possess it.  He may operate a part-time charter business with the

---

[3] The $571,384 is calculated by taking the $325,884 cash requested to pay taxes, meet monthly obligations for family, and to maintain repair, and insure Mr. Ellison's real property for the next 12 months plus $90,500 to insure, repair and pay-off returned equipment, plus $155,000 to start grading and agriculture business.

boat and further increase his chances of being gainfully employed pending trial. Return of the fishing boat is not a necessity, but a return makes sense. The Government has no reason to want to use its property or its personnel to maintain a boat as long as it can be securely maintained and is kept within the jurisdiction. Keeping the boat in a specific location can be made a condition of Mr. Ellison's pretrial release, and there will be no risk to the Government of the loss of this asset.

5. <u>Money</u>. The financial assets held by the Government today far exceed the value of the assets originally seized. The Government is in essence over secured and will be in no worse position than on the day the seizure warrants were executed. The Court could release as much as $721,000 without impacting the Government seizures at all. That is the value of the Schwab account in excess of what the seizure warrants authorized and in excess of the value of the account at the time it was seized. Here, Mr. Ellison is not requesting that all this excess be returned.

Following return of the requested property, the Government will still have *lis pendens* on Mr. Ellison's homes, which are not encumbered by other debt. The personal property (tractors, a truck, and a boat) will all remain in an agreed-upon and court-ordered location and be subject to the Court's jurisdiction and the Government's claims if it prevails at trial. The Government will also have the vast majority of the funds and securities in Mr. Ellison's savings, checking, and securities accounts totaling in the millions of dollars.

In contrast, the gifts alleged to have been given in this case total less than a few thousand dollars. There was no use of any credit card by Dr. Tribble (as alleged in paragraph 42 of the Indictment). Dr. Tribble never even spoke with the realtor that Mr. Ellison referred her to when she obtained her apartment in New York, and (contrary to the allegations in the Indictment) there is no evidence that Mr. Ellison ever paid anything for that apartment. The remaining gifts or favors consist of a ride, a stay at a hotel, or an airplane ticket to an event. Even then, it is beyond dispute that Dr. Tribble paid several thousand dollars for the tickets, and the small number of flights and hotels that the Indictment alleges were given to her. The Government cannot dispute these facts. The

Indictment is simply defective on this count.  It is not clear that in the end the Government will be able to prove that any net items of value were transferred to Dr. Tribble.  And, even if it can establish some small net balance, the Government cannot seriously contend that the gifts or alleged bribes remotely approach the millions it has seized.  And, even if the Government claims that its ultimate loss amount will be measured by the amount of business Cobra obtained, that will require a conviction, and successful completion of an extensive loss calculation hearing in which Mr. Ellison will prove that Cobra was by far the best, most efficient contractor on the island, and actually did the work it was contracted to do, thus calling into question whether the Government will even be able to demonstrate a loss.

In short, the Government has vastly overreached with its aggressive seizure tactics in this case, and Mr. Ellison is now suffering the impact of those tactics.

Mr. Ellison represents to the Court that the physical assets will be used only in the ordinary course of a business that he intends to operate, to maintain them, or for occasional personal use, all within the jurisdictional reach of the U.S. courts.  Of course, if the Court ultimately determines they should be forfeited, they will be.  But, they will be in better condition and have more value if they have been maintained and used than if they sit in a Government yard.  And the vast majority of the funds requested will either be returned to the Government as tax payments or used to improve and maintain the property.  There is no logic or justice to support the Government's seizure or to oppose Mr. Ellison's request.

**D.      The Court has authority to order a partial return of assets pending completion of the criminal case.**

The Court has authority to order the return of property pending trial under the Due Process Clause.  The Due Process Clause always protects defendants against fundamentally unfair treatment by the Government in criminal proceedings.  *United States v. Lovasco*, 431 U.S. 783 (1977).  Due process under the Fifth Amendment is "flexible" and "calls for such procedural protections as the

particular situation demands." *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). "Due process of law must be reasonable, meaningful, and timely or it has no value as a constitutional right." *United States v. Four (4) Contiguous Parcels of Real Prop. Situated in Louisville, Jefferson Cty., Ky.*, 864 F. Supp. 652, 655 (W.D. Ky. 1994). The Due Process Clause requires that the party whose property is taken be given an opportunity for some kind of post-deprivation hearing at which some showing of the probable validity of the deprivation must be made where irreparable injury may result pending final adjudication. *Comm'r v. Shapiro*, 424 U.S. 614, 629 (1976).

## II.   The Court Should Lift the Discovery Stay.

This Court should lift the stay in this case and convene a Rule 26 conference to put a discovery order in place. Although 18 U.S.C. § 981(g)(1) allows the Government to seek a stay of a civil forfeiture action following the commencement of criminal proceedings, that stay is not automatic and the Court has discretion to lift or modify it under appropriate circumstances. *See* 18 U.S.C. § 981(g)(1) (Stay granted "if the court determines" that civil discovery will adversely affect Government's ability to prosecute a related criminal case.); 18 U.S.C. § 981(g)(3) ("[T]he court may determine that a stay is unnecessary if a protective order limiting discovery would protect the interest of one party without unfairly limiting the ability of the opposing party to pursue the civil case. In no case, however, shall the court impose a protective order as an alternative to a stay if the effect of such protective order would be to allow one party to pursue discovery while the other party is substantially unable to do so."); 18 U.S.C. § 981(g)(4) (listing factors a court is to consider when determining whether criminal case is "related" to a civil forfeiture proceeding); *see also United States v. Catalan Roman*, 376 F. Supp. 2d 108, 114–15 (D.P.R. 2005) ("[I]t is well-settled that district courts have inherent power to make and enforce reasonable rules of procedure[.]" (citing *Carlisle v. United States*, 517 U.S. 416, 425–26 (1996)); *accord United States v. Real Prop. & Premises*, 657 F. Supp. 2d 1060, 1064–65 (D. Minn. 2009) (declining to exercise discretion and impose stay) (citing

*Carlisle*, 517 U.S. at 438 n.1 (district court has inherent power to stay proceedings "to control the progress of the cause so as to maintain the orderly processes of justice")).

There is no harm or potential harm to the Government's case or investigation from allowing discovery to proceed in this case. In addition to the arguments made in Mr. Ellison's original Motion to Lift the Stay, the grounds for lifting the stay have only become more obvious with time. There are no surprises left. The Indictment is unsealed. Discovery has been provided. The omissions in the Government's investigation have been identified for the Court in discovery pleadings in the criminal case. The Government effectively conceded that allowing civil discovery of the exact allegations in the Indictment will not harm its case or investigation. The Government allowed civil discovery, including depositions of its grand jury witnesses, to proceed in the MasTec Litigation. Therefore, the Government cannot argue that allowing civil discovery in the civil case it filed will cause any harm to its investigation, especially when it is willing to allow other civil litigants to pursue the same discovery.

Moreover, allowing some civil discovery to proceed in this action is essential for Mr. Ellison to develop his defenses to forfeiture in the civil matter. To the extent that the civil discovery has the secondary effect of helping him be more prepared to defend the criminal case, that is no reason to deny it. The Government has no interest in preventing a defendant in a criminal case from being as prepared as possible to defend against the allegations in a criminal case. *See Berger v. United States*, 295 U.S. 78, 88 (1935) ("The United States Attorney['s] . . . interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done."). If anything, the rules of criminal discovery should provide more, not less, disclosure of relevant facts than the rules of civil discovery, which are bounded by economic limitations of proportionality and undue burden. In a criminal case, the Government has an affirmative obligation to seek and produce all potentially exculpatory information and cannot assert undue burden as a limit on its responsibility to investigate its case fully and fairly. If the Government has conducted a thorough investigation, there should be

no additional discovery generated in the civil case.  On the other hand, if, as we believe is the case, the Government failed to investigate important matters, failed to gather exculpatory information from other agencies that participated in the investigation, and failed to press FEMA and PREPA for all information relevant to Mr. Ellison's guilt or innocence, then allowing civil discovery will only remediate this injustice.

The Government did not have to proceed as it has.  It should have investigated and assessed which assets were traceable to the alleged misconduct and could have been more restrained in its seizures.  It could have adhered to the $1 million limit in its original seizure warrant.  It could have agreed to allow Mr. Ellison to retain the depreciable assets that require maintenance and can be used to earn a living.  It could have allowed Mr. Ellison to maintain the boat, truck, and tractors that were seized.  It could have released enough funds to pay Mr. Ellison's tax liens directly so that he would not incur high fees and interest payments caused by the seizures.  Rather, it seized everything and then waited to commence any case and then sought to stay its own case.  The Court's July 24, 2019 order granting the stay required that the Government file a status report within 60 days indicating whether the stay may be lifted.  Dkt. 6.  The Government never filed a Status Report.  Instead, the Government appears to be content to simply hold on to Mr. Ellison's savings and assets for what has now become an indefinite period, knowing that time is in its favor and that time and financial stress works against Mr. Ellison and increases the probability that he will eventually concede to the Government out of coercion and not because he is guilty of anything.

The combined effect of the standstill in this action, as well as the COVID pandemic, which has delayed the criminal trial, has created an indefinite stay of proceedings.  Indefinite stays should not be upheld.  *See Landis v. N. Am. Co.*, 299 U.S. 248, 257 (1936) ("The stay is immoderate and hence unlawful unless so framed in its inception that its force will be spent within reasonable limits, so far at least as they are susceptible of prevision and description.").  "To require prompt filing of a forfeiture action but allow indefinite postponement of the trial would reduce the filing requirement

to a nullity." *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1163 (2d Cir. 1986). It is well settled that a stay of indefinite duration cannot be granted. *United States v. United States Currency in the Amount of $294,600*, No. CV-91-2567-CPS, 1993 WL 416698, at *4 (E.D.N.Y. Sept. 28, 1993). In that case, the Government gave no indication as to the duration of the requested stay, and an indefinite stay pending resolution of the criminal case would implicate due process concerns and would be unduly prejudicial and burdensome to the defendant.

The Government also has the burden of proof to maintain a stay of a civil forfeiture case. *See United States v. Approx. 81,454 Cans of Baby Formula*, 560 F.3d 638, 641 (7th Cir. 2009). "There is no presumption that civil discovery creates an adverse effect on the Government's related criminal proceeding and the Government must make an actual showing regarding the anticipated adverse effect." *United States v. All Assets & Funds on Deposit or Held in Offshore Inv. Account at Sun Life Fin. Invs. (Berm.)*, 2018 WL 4275214, at *3 (S.D. Tex. Sept. 7, 2018). The Government must make an actual showing that civil discovery will adversely affect the investigation or prosecution of a related criminal case. *United States v. GAF Fin. Servs., Inc.*, 335 F. Supp. 2d 1371, 1373 (S.D. Fla. 2004); *United States v. All Funds ($357,311.68) Contained in N. Trust Bank of Fla. Acct.*, No. 04–1476, 2004 WL 1834589, at *3–4 (N.D. Tex. Aug. 10, 2004) (denying motion to stay because Government did not show that civil discovery would adversely affect criminal investigation); *United States v. One J.P. Morgan Chase Bank Acct.*, No. 1:05-CV-59, 2006 WL 6562918, at *2 (W.D. Mich. Dec. 14, 2006) (same).

Courts frequently lift civil forfeiture stays on due process grounds. In one case, the court found a due process violation to a further extension of a stay of a civil forfeiture case. *United States v. $177,844.68 in United States Currency*, No. 2:13-cv-00100-JCM-GWF, 2015 WL 355495, at *7 (D. Nev. Jan. 27, 2015). In that case, two years had passed since the initial seizure, and another year would pass before the civil forfeiture case was adjudicated. *Id.* at *5. The court applied a four-factor test even where a civil forfeiture case had been brought: (1) length of delay; (2) the reason for the

delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Id*. The pendency of criminal proceedings is only an element to be considered in determining whether a delay is unreasonable. *Id*. at 6. Ultimately, the court found that a due process violation occurred even where the defendants did not show that their ability to defend the forfeiture action had been prejudiced by the loss of evidence or witnesses. *Id*. at 7. The same was true even where discovery may require the Government to produce witnesses that it would call in the criminal case. *Id*.

A Kentucky court likewise denied the Government's motion for stay for equity reasons. *United States v. Contents of Accts.*, No. 3:10-CV-228-H, 2010 WL 2682397, at *2 (W.D. Ky. July 2, 2010). The Government in that case had seized property, initiated a civil forfeiture suit, and moved to stay the civil forfeiture suit. *Id*. The court found a blanket stay to be inappropriate because it would allow the Government to "take[] advantage of the civil forfeiture procedures, then tr[y] to halt the civil suit when it becomes inconvenient." *Id*. The court stated that "it seems inequitable and unreasonable to apply a blanket stay where the Government retains the property." *Id*.

In another case, even in granting a limited stay, the court noted that it "takes seriously Claimants' due process concerns if their property is held for a prolonged period of time without an opportunity to contest that seizure in a court of law." *United States v. Various Gold, Silver & Coins*, No. 3:11-CV-01179-SI, 2012 WL 13055591, at *3 (D. Ore. July 26, 2012). The court in that case required the Government to submit repeated status reports in order to ensure that there was no "extended abatement of proceedings" that "might raise due process concerns." *Id*.

Other courts of appeal have developed a three factor test for determining whether the Government's seizure and retention of property under civil forfeiture statutes, in the absence of a meaningful hearing at a meaningful time, raises due process concerns under the Fourteenth Amendment. *Krimstock v. Kelly*, 306 F.3d 40, 51 (2d Cir. 2002) (citing *Mathews*, 424 U.S. at 333). In *Krimstock*, then-Judge Sotomayor found unconstitutional New York City's continued retention of the defendant's vehicles seized along with an arrest, without providing the defendant a prompt

post seizure hearing at which the defendant could challenge the city's continued retention of the vehicle pending forfeiture proceedings. *Id*. at 60. There are three factors: (1) the nature and weight of the private interest affected by the challenged official action; (2) the risk of erroneous deprivation given the procedures currently employed, and the probable value of additional safeguards; and (3) the Government's interest in avoiding additional procedural safeguards. *Mathews*, 424 U.S. at 335. These factors have been applied to the civil forfeiture context as well. *See James Daniel Good Real Prop.*, 510 U.S. at 48.

A Texas federal court also denied the Government's motion to stay a civil forfeiture case where the Government sought a stay on the basis of a related criminal investigation. *See $357,311.68*, 2004 WL 1834589, at *2. The court held that the Government's arguments were nothing more than speculative when arguing that the defendants would be provided "full discovery rights into their criminal investigation before they are formally charged" and that the defendants could assert their Fifth Amendment rights to avoid responding to reciprocal discovery requests. *Id*. The court held these arguments would apply to "every civil forfeiture case with a related criminal investigation." *Id*. The Government could not point to any specific discovery request or abuse that had taken place and had no legitimate argument about the prospective ability of the defendants to engage in discovery that could compromise the investigation. *Id*.

For the reasons explained above, the Court should lift the stay in this action. The stay has been in place for more than a year, and the Government has not filed any status reports that were required by the Court. The COVID pandemic has vacated the trial settings and there is no expectation that a trial in this case could occur any time soon. Given those circumstances, the stay is indefinite and should, thus, be lifted. It is important to remember that the Mr. Ellison has not been tried. He has not been convicted. No jury has found him guilty of any offense or that his property constitutes the proceeds from any offense. Allowing the Government to retain his property

indefinitely while he waits for his day in court, years in the making, when there is no prejudice to the Government from releasing the property is simply not reasonable.

The Government cannot now credibly claim that civil discovery in the forfeiture case could harm its efforts in the criminal case (like it could when it initially sought the stay). It declined to request a stay and permitted civil discovery to proceed in the MasTec Litigation, a case that contains essentially identical allegations as the criminal case against Mr. Ellison and incorporates by reference the criminal Indictment. For that reason, the Government has now conceded that civil discovery will not impact the prosecution of the criminal case.

The Government's indefinite seizure of Mr. Ellison's money and property and then continued request to stay discovery in this case constitutes a due process concern for the same reasons as the courts cited above. As this case remains stayed indefinitely, Mr. Ellison's boat continues to be damaged sitting in the ship yard in Miami, Florida. Mr. Ellison is not seeking a total return of assets at this time, just those assets that are needed for him to live and work before trial, or which can be better maintained by him. In addition, Mr. Ellison is not asking for a complete lifting of the discovery stay, only for a limited lifting to be determined after the Court hears from the Government and Mr. Ellison as to specific discovery they wish to seek. The negotiation and entry of a discovery order would be the first item of business if the Court allows discovery to proceed in the ordinary course. Therefore, the Court will retain control of the discovery scope and schedule to ensure that it does not interfere with either Mr. Ellison's rights or the Government's interests in this case. This approach has been recognized by other Courts. The Court may enter a protective order limiting discovery such that the defendant can take some discovery, but the Government would not be subjected to full discovery. 18 U.S.C. § 981(g)(3); *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 209, 214 (D.D.C. 2014) (granting motion for protective order and authorizing limited discovery in a civil forfeiture case where there was a related criminal investigation); *United States v. 2013 Jeep Wrangler Sport Utility Vehicle*, No. 6:14-CV-1080, 2014 WL 4225089, at *1 (W.D. La. Aug. 26,

2014) (permitting limited civil discovery in civil forfeiture case where there was a related criminal investigation).

## III.    Mr. Ellison's Bonus Payments and Salary Earned Before Any Alleged Wrongdoing Should Be Released on Statute of Limitations Grounds.

There is an independent reason for release of some of the assets seized by the Government. The Government filed this case more than one year after Mr. Ellison earned bonus payments in 2017 and early 2018. Thus, those payments should be returned to Mr. Ellison.

18 U.S.C. § 984(b) reads that for civil forfeiture of fungible property: "No action pursuant to this section to forfeit property not traceable directly to the offense that is the basis for the forfeiture may be commenced more than 1 year from the date of the offense." The purpose of this one year statute of limitations is because the forfeiture of fungible property (such as cash) must have both a "physical nexus to the tainted property" and "a temporal nexus to the tainted property." *United States v. $79,650 Seized from Bank of Am. Acct. Ending in—8247, in name of Afework*, No. 1:08-CV-1233-JCC, 2009 WL 331294, at *2–4 (E.D. Va. Feb. 9, 2009).

The Government must actually file the forfeiture complaint within one year of the date of the offence. *United States v. $8,221,877.16 in United States Currency*, 330 F.3d 141, 157–61 (3d Cir. 2003); *United States v. $303,581.82 in United States Currency*, No. 2:08-CV-670, 2010 WL 1657154, at *2 (D. Utah April 22, 2010) (holding that Section 984, "by its plain and unambiguous language[,]" required the filing of a complaint within one year of the offense); *Unites States v. Currency, $300,000 Seized From Bryant Bank Acct. No. XXX-XX-XXXX*, No. 2:12-CV-2431-AKK, 2013 WL 1498972, at *5–7 (N.D. Ala. April 9, 2013) (granting motion to dismiss because one-year statute of limitations barred the seizure of $120,000 seized more than one year after the date of the offense); *United States v. $83,274.51 Seized from BBVA Compass Bank Acct. No. xxxx9194*, No. 2:13-cv-153-JEO, 2013 WL 5524729, at *7 (N.D. Ala. Sept. 30, 2013) (granting motion to dismiss based on one-year statute of limitations in Section 984 where structuring offense occurred on January

18, 2012, but the Government did not file its complaint until January 23, 2013); *United States v. $73,947.35 in United States Currency from JP Morgan Chase Bank Acct. XXXXX*, No. 3:18-CV-213-B, 2018 WL 3956447, at *3–4 (N.D. Tex. Aug. 17, 2018) (granting motion to dismiss forfeiture complaint under Section 984 where the criminal activity justifying the seizure occurred more than a year before the Government filed its complaint).

In *$303,581.82*, the court granted a motion to dismiss a civil forfeiture complaint on statute of limitations grounds. 2010 WL 1657154, at *3. The Government sought forfeiture from a Wells Fargo bank account that was not directly traceable to an allegation that the individual structured transactions to evade reporting requirements. *Id*. at *1. Cash meets the definition of fungible property sufficient to apply the one-year statute of limitations. *Id*. at *3. The court held that the one year statute of limitations in Section 984 applies to "any *in rem* forfeiture action in which the subject property is cash or other fungible property that is not directly traceable to the offense." *Id*. The Government seized the funds from the bank account within one year of the date of the offense, but did not initiate the civil forfeiture proceeding until more than one year after the date of the offense. *Id*. The court held that the action was time barred and granted the motion to dismiss. *Id*.

Here, the civil forfeiture complaint was filed on July 18, 2019, and specifically lists that it is brought, in part, under 18 U.S.C. § 984, which is the provision that contains the one-year statute of limitations cited above. The trigger date for the statute of limitations is the filing of the complaint (July 18, 2019), not the date that the seizures commenced (April 2019). That means that the offense giving rise to the forfeiture claim must have occurred after July 18, 2018. Thus, salary and bonus payments received by Mr. Ellison in 2017 and early 2018 in connection with his work in Puerto Rico fall outside the statute of limitations because they were paid and earned more than one year from the date the Government filed the civil forfeiture complaint.

If the statute of limitations is applied to payments made, those payments are:

- 2017: $300,000 base salary plus $696,000 discretionary bonus.

- January 2018: $1.335 million bonus and base salary of $50,000.

These payments alone total $2,381,000 that are wholly outside the statute of limitations.

However, if the statute of limitations is applied to bonuses earned (even if not paid until a later time), an alternate way of calculating the bonuses Mr. Ellison earned before any alleged misconduct is to simply estimate the EBITDA impact of the first $450,000,000 in work awarded to Cobra, all before any alleged misconduct. The value of Mr. Ellison's bonuses prior to any misconduct would be in the neighborhood of $6,750,000. Either way, Mr. Ellison is entitled to the return of a portion of the funds seized, as requested in this Motion.

## CONCLUSION

For these reasons, Mr. Ellison requests that the Court release the requested property seized by the Government pending the trial in this matter that is not traceable to any offense. Mr. Ellison also requests that the Court lift the stay of discovery in this case to permit Mr. Ellison to pursue limited discovery.

Dated: April 15, 2021

/s/William J. Leone
William J. Leone (*pro hac vice*)
william.leone@nortonrosefulbright.com

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Tel: 212-318-3000
Fax: 212-318-3400

Nathan B. Baum (*pro hac vice*)
NORTON ROSE FULBRIGHT US LLP
2200 Ross Ave., Suite 3600
Dallas, TX 75201
Tel: 214-855-7487
Fax: 214-855-8200

Sonia I. Torres-Pabón (USDC-PR No. 209310)
storres@melendeztorreslaw.com
MELENDEZ TORRES LAW
MCS Plaza, Suite 1200

255 Ponce de Leon Ave.
San Juan, P.R. 00917
Tel: 787-281-8100
Fax: 787-281-8310

**ATTORNEYS FOR DONALD KEITH
ELLISON**

## CERTIFICATION

**IT IS HEREBY CERTIFIED** that on this same date I electronically filed the foregoing motion with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Nathan Baum*
Nathan Baum

## CONFERENCE

**IT IS HEREBY CERTIFIED** that counsel for the Government and counsel for Ellison have conferred on the relief sought in this Motion, and the parties have been unable to resolve the relief requested in this Motion.

*/s/ William J. Leone*
William J. Leone